UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                                                     :

A.M., individually and on behalf of E.H., a child  :
with disability,                                          :
                                                                     :      14-CV-9224 (JPO)
                               Plaintiff,      :
                                                                      :      <u>OPINION AND ORDER</u>
                         -v-                                          :
                                                                      :
NEW YORK CITY DEPARTMENT OF                   :
EDUCATION,                                           :
                                                                     :
                                      Defendant.  :
------------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

       Plaintiff A.M. filed this action on November 20, 2014, seeking tuition reimbursement under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq*. (Dkt. No. 2.) A.M. moved for summary judgment on April 10, 2015, and the New York City Department of Education ("Department") cross-moved for summary judgment on May 8, 2015. (Dkt. Nos. 9, 13.) For the reasons that follow, A.M's motion is denied and the Department's motion is granted.

**I.    Background**

       The following facts are not in dispute. *See Christian Sanches v. United Sates*, No. 13-cv-2536, 2015 WL 667521, at *1 (S.D.N.Y. Feb. 17, 2015) (Oetken, J.).

       Under the IDEA, a state must craft individualized educational programs ("IEPs") for disabled children to ensure that each child receives a "free appropriate public education" ("FAPE"). *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 174-75 (2d Cir. 2012) (citing 20 U.S.C. § 1414(d)). An IEP is "a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance,

and describes the specially designed instruction and services that will enable the child to meet those objectives." *Id.* (quoting *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 507-08 (2d Cir. 2006)). In New York, a Committee on Special Education ("CSE") formed from the student's parent(s), a teacher, a school board representative, a parent representative, and others "examine[s] the student's level of achievement and specific needs" and develops the IEP. *Id.* (citing N.Y. Educ. Law § 4402(1)(b)(1)(a)).

E.H., the child of A.M., was born in 2005 and is autistic. (Dkt. No. 15 ¶¶ 2-4.) After attending pre-kindergarten programs, E.M. attended the private Manhattan Children's Center ("MCC") for the 2011-12 school year. (*Id.* ¶ 5; Dkt. No. 14 at 6-7.) On May 23, 2012, the Department convened a CSE to develop E.H.'s IEP for the 2012-13 school year. A Department special education teacher (Judy Sommers Schneid), a Department psychologist (Nessan O'Sullivan), a parent representative (Marie Wise), and A.M. met as the CSE. Four staff members from MCC—the assistant educational coordinator, a lead teacher, an occupational therapist, and a speech/language pathologist—participated by phone. (Dkt. No. 14 at 7; Dkt. No. 15 ¶¶ 12-15; IHO Decision at 30.) The CSE reviewed psychological evaluations submitted by the parent and the Department, as well as a speech and language report, an occupational therapy report, and an educational progress report. (Dkt. No. 14 at 7.)

Based on the recommendations of the Department representatives on the committee, and over the objections of the parent and MCC staff, the CSE's IEP recommended a 6:1:1 special education class. (Dkt. No. 12 at 2; Dkt. No. 14 at 7; Dkt. No. 15 ¶ 16.) A 6:1:1 classroom has six students, one teacher, and one paraprofessional aide. *R.E.*, 694 F.3d at 175. In the CSE's view, E.H.'s special services "need to be delivered within some social context" to help him "develop[] an awareness of peers, participation of peers, and maneuvering of himself within the context of other children." (Transcript at 63.) The IEP did not specify a particular methodology

for use in the class, but it did recommend that E.H. receive weekly speech-language therapy, occupational therapy, and physical therapy. (Dkt. No. 14 at 8.)

New York regulations also require CSEs to develop a functional behavioral assessment ("FBA") for a student "whose behavior impedes his or her learning or that of others." N.Y. Comp. Codes R. & Regs. Tit. 8 § 200.4(b)(1)(v). An FBA identifies "the problem behavior," "contextual factors that contribute to the behavior," and "a hypothesis regarding the general conditions under which a behavior usually occurs." *Id.* § 200.1(r). When the problem behavior "impedes [a student's] learning," the CSE must develop a behavioral intervention plan ("BIP") "with strategies to deal with [it]." *R.E.*, 694 F.3d at 190. In this case, the CSE drafted a combination FBA/BIP based on a version offered by MCC. (Dkt. No. 12 at 2; Dkt. No. 14 at 9.)

Rather than transition to the public school classroom, A.M. continued E.H.'s enrollment at MCC. On September 4, 2012, A.M. also sought review of the IEP before an impartial hearing officer ("IHO"). (Dkt. No. 14 at 9.) The IHO issued a pendency order—directing the Department to cover E.H.'s tuition at MCC during the course of the proceedings—on January 23, 2013. (*Id.*)

After two hearings, the IHO issued a decision on March 26, 2013, denying the parent's reimbursement request. (*Id.* at 10.) In the IHO's view, the IEP was "reasonably calculated to enable the Student to make educational progress." (IHO Decision at 12.) The IHO concluded that "[t]here is little disagreement among the parties as to the Student's needs. Rather, there is a disagreement regarding methodology and the need for one to one instruction for the majority of the day for children with autism." (*Id.* at 9.) The IHO recognized that the representatives from MCC and several of the reports recommended that E.H. receive one-on-one applied behavioral analysis therapy ("ABA"). (*Id.* at 9-10.) Nonetheless, the IHO agreed that the specific methodology was better left to E.H.'s teachers and providers, as the IEP allowed, and that E.H.

3

had shown an ability to handle—and a need for—classrooms with peer interaction. (*Id.* at 10-11.) The IHO also concluded that the Department's FBA/BIP satisfactorily incorporated content from MCC's draft. (*Id.* at 11-12.)

A.M. appealed, and the State Review Officer ("SRO") affirmed the IHO's decision on November 14, 2014. The SRO both endorsed the IHO's careful review of the evidence and, after an independent review, agreed with her conclusion. (SRO Decision at 6.) While the SRO also recognized that A.M. and the MCC representatives thought that ABA in a 1:1 setting was the only avenue for E.H's continued educational progress, the SRO concluded that a CSE need not specify methodology on an IEP, and that E.H.'s teacher could elect to use ABA in the 6:1:1 class if needed. (*Id*. at 7-8)

After exhausting the administrative appeals process, A.M. filed a complaint in this Court. *See* 20 U.S.C. § 1415(i)(3)(A).

**II.     Legal Standard**

"IDEA actions are generally resolved on summary judgment." *S.B. v. N.Y.C. Dep't of Educ.*, No. 14-cv-0349, 2015 WL 3919116, at *3 (S.D.N.Y. June 25, 2015) (citation omitted). The standard in IDEA cases is not, however, the familiar one from Federal Rule of Civil Procedure 56. Instead, summary judgment "is a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in IDEA and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits." *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) (citation and internal quotation marks omitted). The district court must make that determination based on the preponderance of the evidence. *R.E.*, 694 F.3d at 184. While this standard is not merely review for substantial evidence or clear error, *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 205 (1982) (substantial evidence); *C.F. ex*

4

*rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014) (clear error), it "nevertheless falls well short of complete *de novo* review." *C.F.*, 746 F.3d at 77.  Federal courts "defer to the reasoned conclusions of the SRO as the final state administrative determination," and to the IHO "when considering an issue not reached by the SRO." *Id.*  That deference is particularly strong with respect to determinations as to the substantive adequacy of an IEP, "decisions involving a dispute over an appropriate educational methodology," and decisions "based entirely on the same evidence as that before the SRO." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012).

IDEA claims for tuition reimbursement are adjudicated through the *Burlington/Carter* test.  *C.F.*, 746 F.3d at 76; see *Florence Cnty. Sch. Dis. Four v. Carter*, 510 U.S. 7 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985).  Under that test, courts assess "(1) whether the school district's proposed plan will provide the child with a free appropriate public education; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities." *C.F.*, 746 F.3d at 76.  Because the Court concludes that the school district's IEP would have provided E.H. with a free appropriate public education, it need not decide whether MCC was a suitable placement for E.H., nor whether the equities favor reimbursement in this case.

### III. Adequacy of the Proposed Plan

"The first element of the *Burlington/Carter* Test has two components." *Id.* at 78.  First, the court examines any procedural violations of the IDEA.  Such violations "only entitle parents to reimbursement if they 'impeded the child's right to a free appropriate public education,' 'significantly impeded the parents' opportunity to participate in the decisionmaking process,' or 'caused a deprivation of educational benefits.'" *Id.* at 78-79 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)); *see id.* at 72 (describing a free appropriate public education as an education

5

including "special education and related services tailored to meet the unique needs of a particular child" that is "reasonably calculated to enable the child to receive educational benefits" (citation and internal quotation marks omitted)). "Second, courts 'examine whether the IEP was substantively adequate, namely, whether it was reasonably calculated to enable the child to receive educational benefits.'" *Id.* at 79 (quoting *R.E.* 694 F.3d at 190).

A.M. challenges both the procedural and substantive adequacy of the IEP. After review of the record, the Court concludes that the Department offered E.H. a free appropriate public education.

### A. Procedural Adequacy

A.M. alleges three procedural violations: (1) the IEP failed to include a transition plan for E.H. into his new school, (2) the IEP failed to include parental counseling and training, and (3) the FBA/BIP was inadequate. (Dkt. No. 12 at 8, 15; Dkt. No. 14 at 13.)

First, A.M. alleges that E.H. requires a formal transition plan to ensure a successful transition to a different school environment. (Dkt. No. 12 at 10-11.) The IEP neither included such a plan nor discussed transition-related concerns. As the Department observes, however, A.M. has "not identified any legal requirement that an IEP contain a transition plan, nor ha[s A.M.] articulated why the absence of such a plan was so significant as to deny [the child]" a free appropriate public education. *R.E.*, 694 F.3d at 195. Courts in this district have repeatedly held that the IDEA's procedures do not require that an IEP include transition planning, and that the absence of a transition plan alone is insufficient to show denial of a FAPE. *See J.C. ex rel. CC. v. N.Y.C. Dep't of Educ.*, 13-cv-3759, 2015 WL 1499389, at *17-18 (S.D.N.Y. Mar. 31, 2015) (collecting cases). Accordingly, the absence of a formal transition plan is not a procedural violation.

Second, A.M. alleges that E.H. is entitled to parental counseling and training, so that the parent may understand E.H.'s special needs and support the implementation of E.H.'s IEP. *See* 8 N.Y.C.R.R. § 200.1(kk). (Dkt. No.12 at 14.) The Department concedes that New York regulations require an IEP to include provisions for parent counseling and training. *See id.* §§ 200.4(d)(2)(v)(b)(5), 200.13(d); *see also C.F.*, 746 F.3d at 73. (Dkt. No. 14 at 14.) And the IEP does not include such provisions, so it contains a procedural violation. (SRO Decision at 6 n.1.)

"[T]he Second Circuit has been clear," however, "that the failure to include parent counseling and training in an IEP is itself insufficient to establish the denial of a FAPE." *B.K. v. N.Y.C. Dep't of Educ.*, 12 F. Supp. 3d 343, 366 (E.D.N.Y. 2014) (citing *R.E.*, 694 F.3d at 191). That is so because state regulations already require school districts to provide parental counseling, whether or not it is included in the IEP. *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 142 (2d Cir. 2013); *see also, e.g., F.L. ex rel. F.L. v. N.Y.C. Dep't of Educ.*, 553 F. App'x 2, 7 (2d Cir. 2014). And this case presents no special circumstance justifying deviation from that rule. Rather, O'Sullivan testified that during the CSE's discussion on E.H.'s recommended program, "it was explained to the parent at the outset that one of the defining features of this program was that it did have a parent training component to it as well, as part of the program." (Tr. at 59-60.)

Finally, A.M. alleges that the Department failed to provide an appropriate FBA/BIP with the IEP. (Dkt. No. 12 at 13.) As described above, an FBA identifies the student's problem behaviors in concrete terms and identifies the contextual factors and conditions that contribute to the student's behaviors. *R.E.*, 694 F.3d at 190. A BIP provides strategies to ameliorate the problem behaviors so they do not impede learning. *Id.* "[F]ailure to conduct an FBA is a procedural violation, but . . . it does not rise to the level of a denial of a FAPE if the IEP

adequately identifies the problem behavior and prescribes ways to manage it." *Id.* (citing *A.C.*, 553 F.3d at 172).

The record does not support the conclusion that the FBA/BIP was inadequate. The final FBA/BIP was based on a draft submitted by MCC, E.H.'s school for the previous year. (Dkt. No. 14 at 16.) Consistent with the MCC FBA/BIP, the Department explains that E.H. engages in "Palilalia: Non contextual vocalizations or vocalizations emitted in a high pitched tone" and "Physical Stereotypy: Tapping on surfaces or part of the body." (*See* MCC FBA/BIP at 4-5).) Similarly, the Department's FBA/BIP explains that the "presumed purpose[s]" of the behaviors are "[s]ensory stimulation," "task avoidance," and "[a]ccess to preferred attention or toy." These behaviors, the Department's FBA/BIP notes, are drawn from "diverse antecedents," but often from "[l]ack of active engagement." (*See id.* at 7 ("Both target behaviors occur throughout the day across various antecedents.").) The Department's FBA/BIP then identifies a series of strategies, also drawn from the MCC FBA/BIP, for addressing the behavior: "[e]xpand repertoire of reinforcer and play skills," "[r]eplace verbal stereotype with communication skills," "[r]edirection and refocus," "[i]ncrease functional naming of objects in environment," and "[d]ifferential reinforcement of other behaviors." (*See id.* at 8-9) Positive reinforcement for E.H. includes "[a]ccess to certain toys," "action figures," "computer," and "dinosaur related toys and activities." (*See id.* at 2 (listing "action figures," "computer," and "dinosaur-related activities" as potential reinforcers)). This description "adequately identifies the problem behavior and prescribes ways to manage it." *R.E.*, 694 F.3d at 190.

A.M. argues that the Department's FBA/BIP "completely eviscerated" the MCC draft. (Dkt. No. 12 at 13.) But so long as the Department's own FBA/BIP is adequate, it does not matter that the Department's draft omitted MCC's charts, citations to academic support, or other information. The substantive information that the Department omitted largely includes

additional strategies for mitigating E.H.'s problem behaviors, including intensive tact instruction and practice sitting and waiting.  (Dkt. No. 12 at 13.)  A.M. cites no case for the proposition that an adequate FBA/BIP must include more specific strategies, or that the exclusion of such strategies results in the denial of a free appropriate public education.  In the only case that A.M. does cite, the IEP was inadequate because the CSE failed to create any FBA or BIP at all.  *R.E.*, 694 F.3d at 194.  And elsewhere in the same case, the Second Circuit described an FBA at a similar level of generality—including terms like "verbal support, redirection, [and] prompting"—as containing "specific strategies."  *Id.* at 193; *see B.K. v. N.Y.C. Dep't of Educ.*, 12 F. Supp. 3d 343, 364-65 (E.D.N.Y. 2014).  Having reviewed the record, including both FBA/BIP plans at issue, the Court agrees with the IHO that the "FBA prepared by the CSE takes the information from the FBA prepared by MCC and uses it appropriately" in a "concise" and "usable" form.  (IHO Decision at 10-11.)  Indeed, the SRO noted that no member of the CSE objected to the CSE's FBA/BIP at their May 2012 meeting.  (SRO Decision at 7.)

      **B.**    **Substantive Adequacy**

The core of the parties' disagreement is whether the 6:1:1 classroom, in which the methodology is left to the teacher, is substantively adequate, or whether E.H. needs a 1:1 classroom that applies the ABA methodology all day.  That dispute is a debate over educational methodology, based on the record before the SRO.  In such a case, courts typically defer to the decision of the SRO.  *M.H.*, 685 F.3d at 244.

A.M. argues that the decisions of the SRO (and IHO) here are not entitled to deference because they are wholly unsupported by the record.  A.M. notes that the written reports and the MCC officials testifying at the hearing recommended ABA and 1:1 instruction.  (Dkt. No. 12 at 10.)  A.M. notes, further, that the Department's representatives on the CSE never met or provided educational services to E.H.  (Dk. No. 12 at 11.)  As A.M. correctly observes, where

"almost all of the reports" before an IHO find that a student needs ABA therapy, and the remaining evidence emphasizes that the student needs "a high level of support," the Department may not endorse a 6:1:1 classroom with "no guarantee of ABA therapy or any meaningful 1:1 support." *R.E.*, 694 F.3d at 193-94.

This is not a case, however, in which the Department ignored the "clear consensus of [the student's] evaluators." *Id.* at 181. Rather, in this case, the SRO and IHO deviated from the consensus of the parent's evidence, including the representatives from MCC. But their conclusion was consistent with the views of the evaluator on the CSE—O'Sullivan, a school psychologist. O'Sullivan concluded that "many of the student's needs involved developing reciprocity, developing an awareness of peers, and maneuvering himself within the context of other children within a classroom setting." (SRO Decision at 8.) In O'Sullivan's view, a 6:1:1 setting would better facilitate those goals. The 6:1:1 setting did not expressly include ABA, but it also did not exclude ABA: O'Sullivan "didn't want to tie the hands of the different disciplines that would be working with" E.H. by requiring a specific methodology for part or all of the day. (Tr. at 60.) That MCC preferred a different methodology "does not have to guide the decisions of the CSE." (IHO Decision at 10.)

Though O'Sullivan did not personally evaluate E.H., the reports of those who did evaluate E.H. contain ample support for the CSE's conclusion. For example, as the IHO noted in its thorough decision, the 2010 psychology report suggested that E.H.'s classroom include "good peer models" and a "small structured classroom setting." (*Id.* at 5.) Similarly, an MCC representative explained that E.H.'s attention had improved at MCC, and E.H.'s mother testified that he had previously attended 12:1 and 6:1:1 classes, as well as a karate class. (*Id.* at 11, 13.) A.M. faults the CSE for lacking "a single evaluation report that contradicts the strong recommendations for ABA and one-to-one presented by the parent." (Dkt. No. 16 at 2.) But the

10

CSE may come to an independent conclusion of the student's needs from the *content* of the evaluation reports; the CSE need not simply accept the conclusion of those reports absent an in-person evaluation with the student.

Moreover, the Department's CSE representative was not the only official with educational expertise who thought a 6:1:1 setting was adequate after review of the record. The SRO's opinion reviewed the controlling law and evidence in eight single-spaced pages as it reached its conclusion. *Cf. Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist.*, 773 F.3d 372, 387 (2d Cir. 2014) (deferring to the "detail[ed]" "four single-spaced pages" reviewing the record in the SRO's opinion). That conclusion ratifies the IHO's thorough, thirteen-page opinion. "State educational authorities possess greater expertise in drawing conclusions from educational proceedings," and "the SRO's determination in this case is sufficiently reasoned and supported by the record to merit deference." *Id.* at 386-87.

In an attempt to salvage her argument, A.M. argues that the SRO's decision and the Department's arguments rely on impermissible evidence. (Dkt. No. 16 at 3.) Not so. An IEP "must be evaluated prospectively as of the time of its drafting." *R.E.*, 694 F.3d at 185-86. Accordingly, the SRO may not rely on "retrospective testimony"—"testimony that certain services not listed in the IEP would actually have been provided to the child if he or she had attended the school district's proposed placement." *Id.* at 185, 188. A.M. complains that the SRO relied on O'Sullivan's testimony that the 6:1:1 class is "an intense behavioral intervention," a "full time class with no inclusion component" that "dealt with a number of behavioral concerns similar to those of the student that were addressed through a variety of methodologies" including ABA. (Dkt. No. 16 at 3.)

These comments, however, simply "explain or justify what is listed in the written IEP." *R.E.*, 694 F.3d at 185. Such testimony is permissible. *Id.* The IEP states that E.H. will be

11

placed in a 6:1:1 classroom setting.  The school then introduced testimony that describes a 6:1:1 setting: it is an intense and full-time setting, in which "professionally trained individuals" use multiple methodologies, including potentially ABA.  *See id.* at 187 ("[I]f a student is offered a staffing ratio of 6:1:1, a school district may introduce evidence explaining how this structure operates and why it is appropriate.").  (SRO Decision at 7.)  The testimony does not describe services the student would actually have received, but which were not listed in the IEP.  It is not specific in any way to the particular 6:1:1 classroom in which E.H. would have been placed, as was the retrospective testimony in the primary case on which E.H. relies.  *See P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ.*, 526 F. App'x 135, 140 (2d Cir. 2013); *see also R.E.*.694 F.3d at 187.  Nor does the testimony say that E.H. would in fact have received ABA.  *See R.E.*.694 F.3d at 186; *cf., e.g., id.*at 192 (finding improper testimony that the teacher at the recommended placement "would have provided" more 1:1 instruction if required).

In sum, this dispute turns on whether the 1:1 classroom with ABA all day or the 6:1:1 classroom with more methodological flexibility better meets E.H.'s educational needs—both his need for peer interaction and for learning through one-on-one or small group instruction.  The SRO and IHO considered the proper evidence and decided that the IEP's choice was substantively adequate.  That conclusion is entitled to significant deference and is sufficiently supported by the Court's own review of the record.  *See M.H.*, 685 F.3d at 244; *D.A.B. v. N.Y.C. Dep't of Educ.*, __ F. App'x __, 2015 WL 7273409, at *3 (2d Cir. Nov. 18, 2015).

**IV.     Conclusion**

For the foregoing reasons, the Department's cross-motion for summary judgment is GRANTED and A.M's motion for summary judgment is DENIED. The Clerk of Court is directed to close the motions at Docket Nos. 9 and 13 and to terminate the case.

SO ORDERED.

Dated: December 7, 2015
       New York, New York

_____
J. PAUL OETKEN
United States District Judge